IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MELAURA NOVAK,                          §
                                        §
        Plaintiff,                      §
                                        §
v.                                      §          Civil Action No. 3:10-CV-2123-N
                                        §
ENNIS INDEPENDENT SCHOOL                §
DISTRICT,                               §
                                        §
        Defendant.                      §

**ORDER**

This Order addresses Plaintiff Melaura Novak's motion for judgment on the administrative record [23]. For the reasons that follow, the Court grants in part and denies in part Novak's motion.[1]

**I. ORIGINS OF THE MOTION FOR JUDGMENT**

Up until the 2009-2010 school year, NN, a minor child,[2] was a student at a public school under the purview of Defendant Ennis Independent School District ("Ennis"). During that time, NN was eligible to receive special education and related services as a student with

---

[1]The Court grants Novak's motion to enlarge time to file reply brief [27]. Therefore, it considers Novak's reply with the other briefing on Novak's motion for judgment.

[2]For privacy purposes, the Court will only refer to the minor by his initials.

autism, speech impairment, and mental retardation.  Additionally, Fragile X Syndrome affects NN, although he does not fully manifest all aspects of the syndrome.[3]

On March 5, 2009, Ennis' Admission, Review, and Dismissal ("ARD") Committee met, as it had before, to make recommendations for the goals and objectives of NN's Individualized Education Plan ("IEP") in order to ensure NN's free appropriate public education ("FAPE") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq*.  Novak, NN's mother, originally consented to the IEP but later revoked her consent.  After revoking her consent, Novak requested an independent educational evaluation ("IEE").  Ennis then performed a full and independent educational evaluation ("FIE") in May and July 2009.  The evaluations showed that NN had regressed since previous evaluations, and Ennis subsequently reclassified him from mildly impaired to severely retarded.  Novak disagreed with this FIE on the basis that it was incomplete. Novak then notified Ennis that she would be placing NN at Newfound School ("Newfound"), a private school for disabled children, for the 2009-2010 school year.  Later, Dr. Linda

---

[3]NN's psychiatrist since 2008, Dr. Roger Robinson, stated about NN: "[I]nitially he came [to see me] because his behavior was so extremely violent and unpredictable and bizarre.  And then he also has behaviors that are referred to as rituals, very compulsive behaviors that completely interrupt his functioning and most people around him.  And he also has extreme difficulty with executive function in terms of his ability to maintain, follow through, organize, initiate, shift, manage, and remember things, and process.  He also has psychotic behaviors at times.  At times he's psychotic. . . . he will giggle sometimes inappropriately and – and talk about things that – inanimate objects that are doing human things personified, like they're looking at him, talking about him, things like that."  Redacted Transcript of Hr'g, Oct. 24, 2011, 13-14 [29] [hereinafter Tr.].  "He also has incredible mood instability.  I mean, he can be quite manic and pressured and silly and giddy and aggressive punctuated by period of times that he will actually tell his mother that he is sad . . . ."  *Id.* at 21.

Felini-Smith, a private psychologist, and Scott Gammage, a behavioral specialist, conducted an IEE on Ennis' behalf. Dr. Felini-Smith concluded,[4] among other things, that NN was functioning at a kindergarten/first-grade level, despite being thirteen years old, and she made certain recommendations to promote effective education.[5]

Based on the above information, Ennis' ARD Committee met on October 30, 2009 to construct a new IEP. After that discussion did not result in an IEP, Ennis' ARD Committee met once more on November 11, 2009, in consultation with Dr. Felini-Smith and Gammage, to continue drafting an IEP.

On March 5, 2010, Novak filed a request for a hearing before the Special Education Hearing Officer for the State of Texas ("SEHO"), alleging, among other things, that the IEP developed at Ennis' November 11, 2009 ARD Committee meeting denied NN a FAPE because the IEP was procedurally or substantively insufficient and/or inappropriate. In her petition, she requested that Ennis reimburse her for the cost of Newfound's tuition. The SEHO ruled that the November 2009 IEP did not deny a FAPE to NN, that Novak was not entitled to reimbursement because Newfound was not an appropriate placement for NN, and that the appropriate relief was to require Ennis to comply with specific conditions should Novak choose to re-enroll him at Ennis.

---

[4]Dr. Robinson testified that he had read Dr. Felini-Smith's findings in depth and that he agreed with them. Tr. at 27.

[5]*See* R840-57. Note that all citations preceded by "R" are to the administrative record on file with the Court via CD-ROM.

Novak then filed the instant suit, pursuant to the IDEA, arguing that the SEHO erred in finding that (a) the November 11, 2009 IEP did not deny a FAPE to NN, (b) the reimbursement period was from August 31, 2009 to November 11, 2009, (c) Novak was not entitled to reimbursement because Newfound was inappropriate, and (d) the appropriate relief for NN was to return him to Ennis with certain specified conditions. The Court held a supplementary evidentiary hearing on October 24, 2011 regarding the appropriateness of Novak's placement of NN at Newfound. Novak now moves for judgment on the administrative record.

## II. BACKGROUND ON THE IDEA

The IDEA imposes certain obligations on state and local education agencies to educate students with disabilities in exchange for federal funds. *See, e.g.*, Sarah Kaltsounis, *Cause of Action for Violation of the Individuals with Disabilities Education Improvement Act of 2004 (IDEIA)*, 37 CAUSES OF ACTION 2D 447 (2012). A participating institution must (1) provide each disabled child within its jurisdictional boundaries with a FAPE tailored to his unique needs and (2) assure that it offers such education in the least restrictive environment ("LRE") consistent with the disabled student's needs. *See Hous. Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 583 (5th Cir. 2009) (quoting *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. by Barry F.*, 118 F.3d 245, 247 (5th Cir. 1997)). An institution implements these requirements by developing an IEP for each disabled student. *Id.* The IDEA neither requires an institution to provide its disabled students with the best possible education nor requires an institution to provide an education that will maximize the disabled student's

potential. *Michael F.*, 118 F.3d at 247 (citing *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 188-89 (1982)). Rather, the IDEA guarantees a basic floor of opportunity, *see V.P.*, 582 F.3d at 583, "specifically designed to meet the child's unique needs, supported by services that will permit him to benefit from the instruction," *Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 808 (5th Cir. 2003) (quotation and citation omitted).

### III. STANDARD OF REVIEW

In reviewing a decision of a SEHO under the IDEA, a district court should accord due weight to the SEHO's findings, although it should ultimately "reach[] 'an independent decision based upon the preponderance of the evidence' that is 'virtually de novo.'" *R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1010 (5th Cir. 2010) (quoting *Michael F.*, 118 F.3d at 252). "Indeed, given its adducing of new evidence, even evidence of matters that have occurred since the administrative hearing under review, the district court proceeding under the IDEA is a hybrid, akin to a 'trial de novo.'" *Michael F.*, 118 F.3d at 252. "The IDEA creates a presumption in favor of a school district's educational plan, placing the burden of proof, by preponderance of the evidence, on the party challenging it." *R.H.*, 607 F.3d at 1010-11 (citing *Salley v. St. Tammany Parish Sch. Bd.*, 57 F.3d 458, 467 (5th Cir. 1995)).

Throughout its analysis, a court should remember that "[t]he role of the judiciary is not to second-guess the decisions of school officials or to substitute their plans for the education of disabled students with the court's." *Id.* (citing *Flour Bluff Indep. Sch. Dist. v.*

*Katherine M. by Lesa T.*, 91 F.3d 689, 693 (5th Cir. 1996)). "Instead, the court's role is limited to determining whether those officials have complied with the IDEA." *Id.*

### IV. THE NOVEMBER 11, 2009 IEP DID NOT DENY A FAPE TO NN

In reviewing a SEHO's findings regarding an institution's provision of a FAPE, a district court must first determine whether the State has complied with the procedures set forth in the IDEA. *See Rowley*, 458 U.S. at 206. Then, it goes on to determine if the IEP is "reasonably calculated to enable the child to receive educational benefits[.]" *Id.* at 206-07. The Fifth Circuit uses four factors to determine whether an IEP is reasonably calculated to provide a meaningful education benefit under the IDEA: whether (1) the public agency individualized the program on the basis of the student's assessment and performance, (2) the public agency administers the program in the LRE, (3) the public agency provides the services in a coordinated and collaborative manner with the key stakeholders, and (4) the IEP results in positive academic and nonacademic benefits. *Michael F.*, 118 F.3d at 253-54. There is no precise requirement as to how courts should weigh these factors. *See Richardson Indep. Sch. Dist. v. Michael Z.*, 580 F.3d 286, 293 (5th Cir. 2009).

Because Novak raises no procedural challenges that the Court may consider,[6] the

---

[6]In her motion for judgment, Novak raises two new arguments in support of her contention that the November 11, 2009 IEP was not reasonably calculated to provide a FAPE to NN. First, she argues that the ARD Committee excluded her and her counsel from the ARD meeting on that date, thus violating the IDEA's requirement that a school district provide parents of a disabled student a meaningful role in the process of formulating an IEP. *See* Mot. 21-22. She next argues that Ennis had predetermined that NN's placement would be at Ennis prior to the ARD meeting, thus running afoul of the IDEA's requirement that an ARD committee consider a continuum of alternative placements in developing IEPs. *See id.* at 22-24. However, the IDEA's exhaustion requirement bars Novak from raising these arguments on appeal.

The IDEA provides that a party aggrieved by a SEHO's decision has the right to bring a civil action "with respect to the complaint presented" to the SEHO. *See* 20 U.S.C. § 1415(i)(2)(A); *see also Hooker v. Dallas Indep. Sch. Dist.*, 2010 WL 4025877, at *5 (N.D. Tex. 2010) (Fitzwater, C.J.) ("Section 1415(i)(2)(A) thus limits a party's right of action under the IDEA to issues presented at the due process hearing."). "Th[is] exhaustion requirement allows 'states and local agencies to employ their educational expertise, affords full exploration of technical educational issues, furthers development of a complete factual record and promotes judicial efficiency by giving these agencies the first opportunity to correct shortcomings in their educational programs for disabled children.'" *Wood v. Katy Indep. Sch. Dist.*, 2009 WL 2485967, at *3 (S.D. Tex. 2009) (citing *Hope v. Cortines*, 872 F. Supp. 14, 17 (E.D.N.Y. 1995)).

Novak concedes that she here raises new arguments, but posits that the law on exhaustion prohibits a party from raising new "issues" – not "arguments" – for the first time on appeal. *See* Reply 8 [30]. Thus, she continues, because she exhausted the "issue" of whether the November 11, 2009 IEP was reasonably calculated to provide a FAPE, the IDEA does not bar her from raising new and different arguments as to this issue on appeal. *See id.* Novak is incorrect. Although courts in this District have largely spoken about administrative exhaustion in terms of "issue" exhaustion, *see, e.g., Hooker*, 2010 WL 4025877, at *5, other legal authorities demonstrate that the exhaustion requirement also applies to arguments. For example, a leading treatise on federal procedure explains that "[t]he exhaustion doctrine also covers the situation where one fails to adequately present an *argument* or issue to the agency before seeking review." Charles Alan Wright & Charles H. Koch, Jr., FEDERAL PRACTICE AND PROCEDURE: JUDICIAL REVIEW OF ADMINISTRATIVE ACTION § 8398, at 402 (2006) (emphasis added); *see also Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 462 (6th Cir. 2004); *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1150 (D.C. Cir. 2005) (citing *Coal. for Gov't Procurement*, 365 F.3d at 462)). Thus, the Court does not consider Novak's new arguments because she failed to exhaust them before the SEHO.

Court begins by analyzing Novak's contention that the SEHO erred in finding that Novak had failed to show that the November 11, 2009 IEP was substantively insufficient or inappropriate. The Court first inquires whether Ennis individualized the IEP on the basis of NN's assessment and performance. In finding that the March 5, 2009 IEP failed this prong, the SEHO explained that the March 5, 2009 IEP goals "were not measurable and did not reflect the student's individualized need for instruction based on his assessment and performance at a second grade to third grade level."[7]  SEHO Order 12 [6-1]. The SEHO seems to have relied on the following findings of fact to hold that the March 5, 2009 IEP did not reflect NN's individualized need for instruction based on his assessment and performance: the mastery criterion for NN's math goals was only forty percent, *id.* at 4; the IEP scheduled many of the math, language arts, and behavior goals to continue for an eighteen-month period, *id.* at 4-5; the IEP repeated numerous goals from the 2007-2008 school year, *id.* at 5-6; and the IEP discontinued NN's articulations goals although NN had not mastered them, *id.* at 6. And she seemed to rely on the following findings to determine that the goals were immeasurable: one of the social studies goals was for NN to understand traditional historical points of reference in Texas history, to be assessed immeasurably by his performance on the activities associated with the essence of the Texas Essential Knowledge

---

[7]The Court notes that the SEHO Order is inconsistent as to the grade level upon which NN functioned in 2009-2010. As the above quote demonstrates, the SEHO at one point stated that NN functioned at a second- to third-grade level, *see* SEHO Order 12, but elsewhere stated that NN functions at a first- to second-grade level, *see id.* at 9. Dr. Felini-Smith's report states that NN functioned at a kindergarten/first-grade level in 2009. *See* R842.

and Skills Exam ("TEKS"), *id.* at 5; there was no explanation of the criteria by which Ennis would measure/evaluate NN's progress in social studies and science, *id.*; the language arts goal contained no mastery criteria and did not specifically provide the grade level at which Ennis would assess NN, other than to provide that the language arts teacher would assess NN by his performance on activities associated with the essence of the seventh grade TEKS, *id.*; the Behavior Intervention Plan ("BIP") adopted at the March 5, 2009 ARD meeting stated that NN would need to immeasurably demonstrate self control, *id.*; the speech goals required NN to immeasurably express emotions through verbalization and appropriately request permission, providing no mastery criteria for either objective, *id.*; the goal of "demonstrating progress toward the acquisition toward developmentally appropriate academic skills by increasing curriculum based vocabulary and sequencing pictures to relate a story" contained no mastery criteria, *id.* at 6; the goal of improving intelligibility of speech was vague and immeasurable, *id.*; and the speech therapy goals were vague and immeasurable, *id.* at 6.

After analyzing the November 11, 2009 IEP, the Court finds it to be greatly improved from the March 2009 IEP. *See* R1244-60. It presents goals/objectives that are measurable and clear (i.e., non-vague).[8] The Court also finds that it is largely reflective of NN's

---

[8]For example:

(a) For the speech goal "The student will demonstrate progress toward the acquisition of developmentally appropriate semantic language units": the mastery criteria is eighty percent and one objective under it provides "[NN] will demonstrate the understanding of quantity by sorting pictures of objects into the categories: Few/Many, More/Less and verbalizing 'This one has more. This one has less.' as an example as he sorts them with 80% accuracy." R1245;

(b) For the social skills goal "The student will improve personal-social skills": the mastery criteria reads that "[b]y the end of the school year, [NN] will improve his personal-

ORDER – PAGE 9

individualized need for instruction based on assessment and performance.[9] The only concern

_____

social skills and will demonstrate these skills successfully 70% of the time" and one objective under it provides "[NN] will remain approximately 3 feet from others when engaged in social interaction with 90% accuracy."  R189-90;

(c) For the math goal "Use indirect measurement to solve problems": ". . . The student will be presented with three . . . containers of different sizes and shapes. . . ." and NN's mastery criteria is that he perform the following predetermined tasks from that exercise independently seventy percent of the time – "(1) The student will select a container that approximates a standard measurement for capacity [such as a mug].  (2) The student will record how many times the measuring container was filled to measure the capacity of the other containers.  (3) The student will organize the containers from the container that holds the most to the container that holds the least."  R1251-52;

(d) For the reading goal "Comprehend selections using a variety of strategies": "An age relevant text consistent with student's academic reading level will be read. . . ." and NN's mastery criteria is that he perform the following predetermined tasks from that exercise independently seventy percent of the time – "(1) The student will determine the text's main idea.  (2) The student will determine two details from the text that support the main idea.  (3) The student will generate a summary using the main idea and supporting details."  R1253-54;

(e) For the science goal "Recognizes characteristics of the universe and its parts": "The student will be presented with a representation of Earth and a representation of the moon. . . ." and NN's mastery criteria is that he perform the following predetermined tasks from that exercise independently seventy percent of the time – "(1) The student will generate a list of characteristics of the Earth.  (2) The student will generate a list of characteristics of the moon.  (3) The student will determine a similarity or a difference between Earth and the moon."  R1257; and

(f) for the social studies goal "Uses geographic tools": "The student will be presented with a map that has a legend representing specific locations. . . ." and NN's mastery criteria is that he complete each of the predetermined tasks independently seventy percent of the time – "(1) The student will locate the map's legend.  (2) The student will select a place he or she would like to go by referencing the legend.  (3) The student will locate the place on the map."  R1258.

[9]Although Novak argues that the November 11, 2009 IEP contains duplicate goals from past IEPs, the Court finds that some of the alleged repetitions are not actually duplicative of past goals and finds that of those that are duplicative of past goals, the IEP properly incorporates them because NN has not yet mastered them.  For example, Novak argues that the November 11, 2009 IEP contains speech goals that are repetitive of goals from the March 20, 2007 IEP.  *See* Mot. 11.  However, the Court finds these repetitive goals appropriate given Dr. Felini-Smith's determination that NN's speech skills were severely below grade level.  *See* R851-52.

the Court has is that several speech goals and/or objectives have start dates beginning in 2007 or early 2008, either as a result of a typographical error or indicating that the ARD Committee intended to continue them for more than a year, which the SEHO previously found inappropriate. *See* R1244-47. While the Court does not object to the continuation of speech goals from previous years where necessary to effectuate mastery, it is disconcerting

──────────────

Novak also argues that the November 11, 2009 IEP repeated the math goal "tell time to the quarter hour" from the May 24, 2005 IEP even though NN's April 17, 2006 progress report listed it as mastered. *See* Mot. 11. However, the Court notes that the mastered objective for 2005/2006 was "read numbers on the face of a standard cock, and a digital clock [and] count the minute markers between the numbers on a standard clock," R987, whereas the November 11, 2009 IEP's objective is that "[NN] will be able to tell time to the quarter hour 70% of the time," R1250. It seems as if the former objective involved sequential counting and reading of numbers using a clock as a model, whereas the latter objective involves actual time-telling, so that the two objectives are not repetitive at all.

Novak also contends that the November 11, 2009 IEP repeats the following 2005/2006 goals/objectives: "determine the total value of the coins;" "a science objective involving plants and sunlight;" and a "science objective to compare solids and liquids." Mot. 11. However, the Court finds that these goals/objectives are different from the previous IEP: the coin objective now involves the concept of apportioning money; the science sunlight objective now involves a connection between sunlight as energy; and the science solids/liquids objective now involves recognition of and distinguishing between a solid and a liquid. *See* R1250-1, 1255-56.

Novak additionally argues that the November 11, 2009 IEP inappropriately contains a very basic mapping goal even though the 2005/2006 IEP listed several mapping goals, including one to complete a U.S. map puzzle, as mastered. Mot. 11. However, given that the ARD Committee developed this new mapping goal in conjunction with Dr. Felini-Smith, the Court finds it appropriate.

Finally, Novak argues that "the academic goals are insufficient in that there are not enough for an entire year of classes. For instance, the 11-11-09 IEP lists a total of four goals for Science. Of those four, two are duplicates from the 4th grade IEP. And the first three science goals are very basic, possibly requiring one instructional period." Mot. 12. However, the Court agrees with the collective wisdom of the ARD Committee in conjunction with Dr. Felini-Smith and Gammage, that these goals are appropriate to fill a year of study, especially given the totality of NN's cognitive and behavioral abilities.

that the initial goal would extend beyond a year.  The Court will take this into consideration as it examines the remaining factors.

As to the second *Michael F.* factor, the Court finds that the ARD Committee designed the November 11, 2009 IEP to be administered in the LRE.  Under the IDEA, NN is entitled to have public educators educate him with nondisabled peers to the maximum extent appropriate.  *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1045 (5th Cir. 1989). Specifically, this requirement "permits agencies to place students with disabilities in special classes, separate schooling, or other settings removed from the regular educational environment only when the nature or severity of their disabilities are such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." Kaltsounis, *supra*, at § 5.  To determine whether a school district has met this mainstreaming requirement, courts "ask whether it is possible to educate a disabled child satisfactorily in a regular classroom, using supplemental aids and services, and, if not, whether the school has mainstreamed the child to the maximum extent appropriate."  Brian L. Porto, *Application of 20 U.S.C.A. § 1412(a)(5), Least Restrictive Environment Provision of Individuals with Disabilities Education Act (IDEA), 20 U.S.C.A. §§ 1400* et seq., 189 A.L.R. FED. 297, at § 2(a) (2012).  And, in order to determine whether it is possible to educate a disabled child in a regular classroom, courts look to: (1) the educational benefits available in a regular classroom – supplemented by appropriate aids and services – compared to the educational benefits of a special education classroom; (2) the nonacademic benefits available to the disabled child from interaction with able-bodied children; (3) the effect of

the presence of the disabled child on the teacher and the other children in the regular classroom; and (4) the costs of supplementary aids and services necessary to educate the disabled child in a regular classroom. *Id.*

The evidence presented to the Court very clearly demonstrates that NN cannot function well in a general-education classroom. Dr. Robinson testified that it would be extremely difficult for NN to function in a normal high school because "[h]e is quite unpredictable . . . . [H]e requires a tremendous amount of sustained effort on a one-on-one basis in terms of maintaining behavior control." Tr. 17. During NN's first school year at Newfound, Newfound's former director even felt that Newfound's regular curricula was inappropriate for NN, *see* R1550, even though it caters exclusively or almost exclusively to a disabled population, *see* Tr. 35-36, has a small student-teacher ratio, *see id.* at 36-37 (seventeen students for every five teachers as of October 2011, although downsized from 2010), and was specifically designed for special-education purposes. The November 11, 2009 IEP provides that NN's instruction should be in special-education classes. *See* R1236. The Court finds this segregation from the mainstream student body to be appropriate given NN's behavior in general-education classrooms and the collective wisdom of the ARD Committee, the SEHO, Dr. Felini-Smith, and Dr. Robinson.[10] This is indeed the LRE Ennis can provide given the realities of NN's situation.

_____

[10]Dr. Robinson goes so far as to recommend an "intensive, focused residential program where they really specialize in working with these difficult children 24 hours. That's usually what works the best is to concentrate [on them] all the time." Tr. 23. However, he later stated that "[a]t times NN could – could function in a regular education classroom, although he couldn't have the regular education curriculum." *Id.* at 26.

The third *Michael F.* factor also militates in favor of finding that Ennis' IEP is reasonably calculated to provide NN a FAPE.  It is undisputed that Novak and her counsel did not attend the November 11, 2009 meeting.  *See* R1263.  However, it is also undisputed that Novak and her counsel did attend the October 30, 2009 ARD meeting and that Novak and her counsel received notice of the November 11, 2009 meeting but chose not to attend.  *See* R1261 (attendance on 10/30/09); R1290 (notice); R1296 (email from Novak stating she and her counsel would not attend).  The Court is aware that Ennis delayed delivery of promised paperwork to Novak and her counsel and that this delay apparently prompted Novak and her counsel not to attend.  *See* R1294.  However, it is clear that Ennis did not exclude Novak and her counsel from the meeting.  In contrast, Novak does not dispute that she was able to meaningfully participate in the first meeting where she, her counsel, and the ARD Committee developed a preliminary IEP, that she declined to attend the November 11, 2009 meeting despite receiving notice of it, and that the ARD Committee created the IEP with the aid of Dr. Felini-Smith and Gammage.  Thus, the Court finds that Ennis provided the services in a coordinated and collaborative manner with the key stakeholders.

Finally, the Court cannot make a meaningful determination regarding the fourth *Michael F.* factor – positive academic and nonacademic benefits – because Ennis never implemented the IEP due to NN's enrollment at Newfound.  From the above discussion, however, the Court concludes that Ennis' November 11, 2009 IEP was "reasonably calculated to enable NN to receive educational benefits.  Accordingly, the Court affirms the SEHO's determination that the November 11, 2009 IEP did not deny NN a FAPE.  However,

the Court goes on to determine whether Novak is entitled to reimbursement for the period prior to November 11, 2009.

## V. NOVAK IS ENTITLED TO REIMBURSEMENT

The SEHO determined that Novak was not entitled to reimbursement because Newfound was not an appropriate placement for NN. The Court disagrees.

### A. Newfound is an Appropriate Placement

Punitive or monetary damages of any kind are not available in a private suit under the IDEA. *See* Kaltsounis, *supra*, at § 30 (citing *Diaz-Fonzeca v. P.R.*, 451 F.3d 13, 28 (1st Cir. 2006)). "However, the [IDEA] does allow for reimbursement of past expenses incurred by parents in procuring the services incorrectly denied by a public agency." *Id.* A parent is entitled to reimbursement if (1) the public school placement that the public agency provided or offered to the child was not an appropriate placement under the terms of the IDEA and (2) the private school placement is appropriate. *See Sch. Comm. of the Town of Burlington, Mass. v. Dep't of Educ. of the Commonwealth of Mass.*, 471 U.S. 359, 369 (1985). A private school placement may still be appropriate even if it is a more restrictive environment than that of a public placement – "the test for the parents' private placement is that it is appropriate, and not that it is perfect." *Warren G. ex rel. Tom G. v. Cumberland Cnty. Sch. Dist.*, 190 F.3d 80, 84 (3d Cir. 1999); *see also Cleveland Heights-Univ. Heights City Sch. Dist. v. Boss*, 144 F.3d 391, 399-400 (6th Cir. 1998). "[P]arents are not barred from reimbursement because the private school did not meet the precise IDEA definition of a [FAPE], because [the] IDEA requirements 'cannot be read as applying to parental

placements.'" *Michael Z.*, 580 F.3d at 295 (citing *Florence Cnty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, 9 (1993)).  Indeed, transfers of students to schools specializing in disabled students "after years of frustration in the public schools is a far cry from 'the apparently widespread practice of relegating handicapped children to private institutions or warehousing them in special classes' that concerned Congress." *C.B. ex rel. B.B. Special Sch. Dist. No. 1, Minneapolis, Minn.*, 636 F.3d 981, 991 (8th Cir. 2011).

"A court has broad discretion to grant appropriate relief under the IDEA."  3 AMERICANS WITH DISABILITIES: PRACTICE & COMPLIANCE MANUAL § 11:307.  "The relief is to be appropriate in light of the IDEA's purpose, and equitable considerations are relevant in fashioning relief, including equitable considerations relating to the reasonableness of the action taken by the parents." *Id.* (footnotes omitted).

Given the unappealed SEHO's finding that the March 5, 2009 IEP denied NN a FAPE, the Court finds that, at the time Novak placed NN at Newfound, Ennis was an inappropriate placement.  The Court further finds that Novak has more than met her burden to show that Newfound is an appropriate placement.

The SEHO determined that Newfound was an inappropriate placement for NN for the following reasons: (a) NN's behavior deteriorated upon enrollment at Newfound; (b) NN failed to master his behavioral goals, and aggression continued to be a problem behavior at the time of the administrative hearing; (c) NN was isolated within the disabled student body to control his behaviors; (d) NN received no speech therapy despite a significant language and articulation disorder; (e) Newfound provided no "related services"; and (f) Newfound

personnel did not believe Newfound was appropriate for NN. *See* SEHO Order 14. However, the administrative record, along with the additional information before this Court from the October 2011 hearing, demonstrates that Newfound is an appropriate placement for NN.[11]

First, the Court notes that the SEHO herself conceded that NN's downward behavioral spiral shortly after his transfer to Newfound had little or nothing to do with Newfound itself. *See* SEHO Order 14. Rather, NN's behavior most likely deteriorated due to the onset of puberty. *See* R2449-50; Tr. 14 (Dr. Robinson testifying that treatment of his patients necessarily changes during puberty due to changes in behavior). Thus, those behavioral problems should have little bearing on the appropriateness of Newfound for NN.

Next, the Court concludes that NN's progress at Newfound demonstrates that Newfound is an appropriate placement for NN, albeit challenging at the beginning. Many of the protocols that Newfound has implemented are compatible with Dr. Robinson's determination of NN's needs. For example, Dr. Robinson testified that NN

> requires a lot of . . . work, and not just the work, but also the understanding of . . . how to respond to him and how to manage him and when to . . . push and when to back up and when to provide alternatives and, most importantly, the kind of preventive environment and the kind of preventive things you have to do to help him. . . . [Y]ou have to design things so that it prevents situations where he would be scared, anxious, overwhelmed or not understand. For example, you would want to really let him know in advance how the day was

---

[11]The Court notes that Novak's decision to place NN at Newfound was reasonable. Novak placed NN at Newfound after he had spent his entire academic career at Ennis. *See* R840. Her decision was the culmination of many years of attempted instruction and an ultimate determination by outside professionals that NN needed a revamped comprehensive behavioral and educational plan.

evolving, how the next hour was evolving. And you would want to communicate with him in a way that he could understand.

Tr. 17-18. To address these needs, Newfound has put in place extensive protocols to manage transitions. This is particularly evident in the detailed protocols Newfound implemented for school drop-off and pick-up, as well as bathroom use.[12] *See* Pl.'s Ex. 2, pp. 6-7.[13] Newfound has also instituted a daily schedule for NN, which it follows very faithfully and includes reinforcement tools (such as stickers and watercolors) and leisure activities (such as Legos

---

[12]Dr. Marsha Guernsey, Director of Newfound, testified that "[w]hen his mother does arrive in the morning, she comes to the back of the building, and there are three people, three staff members, who go out to get NN each morning. Likewise, those same three people escort him out of the building at the end of the day. That is to ensure his safety as well as the safety of others as he enters the building. And when the door to the truck is opened, usually his mother will either get out and hand one of us his backpack and lunch and so forth or I will reach into the back fo the truck and take it out. At that point, one of the staff members gets into the back of the truck and puts her hand up over [NN's] forehead and holds [NN's] forehead so that [NN] is comfortable but is still restrained in a – in a comfortable manner so that [NN] cannot attempt to head butt. Another staff member will reach across and unbuckle or buckle, whether it's departure or – arrival or departure, and lift one of [NN's] legs out, then move the other leg out, and then pull him out by his arms so that he gets out of the car. The staff member in the back of the car then gets out and takes [NN's] other arm and escorts him very quickly into the building." Tr. 40-41. Dr. Guernsey further testified: "I have found that by following this type of a procedure every day, that [NN] does benefit from that in that his day starts in a routine fashion every way and he feels very secure in it." *Id.* at 42. She testified that this protocol has extinguished his previous negative behaviors upon entering and leaving the school, such as grabbing people, attempting to pull hair, attempting to hit, attempting to kick walls, yelling, and screaming. *See id.* at 42-43. Pages 43-44 of the Transcript detail the bathroom use protocol.

[13]Exhibit numbers refer to exhibits offered at the October 2011 evidentiary hearing.

and dot-to-dot puzzles). *See* Tr. at 53; Pl.'s Ex. 2, pp. 8-9. Dr. Robinson testified that NN's behavior has improved since 2008. Tr. at 26.[14]

Academically, NN has also improved. *See* Tr. 47 (Dr. Guernsey's testimony). Newfound created goals and objectives for NN similar to those one would find on an IEP. *See* Pl.'s Ex. 2, pp. 3-4. Newfound fashioned them based on NN's results from annual Brigance testing, a criterion-referenced assessment tool indicating how a student is performing in a given subject or academic area. *See id.* at 2 (Brigance testing results); Tr. 48. These test results indicate that since NN has been at Newfound, he has improved in areas "such as telling time, recognizing money and using money, [and] understanding and using words to a much greater extent than he has been able to do in the past." *Id.* at 49. Dr. Guernsey testified that, over his time at Newfound, NN has increased "anywhere from a readiness level to – in some instances to third and fourth grade level." *Id.* This is in contrast to NN's functioning at a kindergarten to first-grade level in 2009 based on the Brigance exam. *See* R842. NN's progression has happened in part due to the protocols, but also because Newfound has discovered how to educate NN "using things that are highly motivating for him." *Id.* at 50. Dr. Guernsey testified that "[h]e loves things, for instance,

---

[14]Newfound also implemented behavioral goals. *See* Pl.'s Ex. 2, p. 5. It targeted those goals toward improving NN's interpersonal skills with teachers and other students. *See* Tr. at 51. Dr. Guernsey testified that NN "has certainly made a tremendous amount of progress in that regard . . . [and] has [even] started to look forward to participating [with others]" in ways that Dr. Guernsey would not have even considered a possibility a year ago. *See id.* at 52. Dr. Guernsey also testified that her staff at Newfound had not had to restrain NN at all during the 2011-2012 school year up to the date of the evidentiary hearing even though they had to restrain him several times the prior school year, attributing this improvement to Newfound's Behavior Plan. *See id.* at 53; Pl.'s Ex. 2, pp. 6-7 (Behavior Plan).

that relate to the weather or to animals. This morning, in fact, he asked me if he could begin to study insects. So he does have interests, and if you're willing to take advantage of those and base your program around those kinds of things, he will work quite well." *Id.* at 50-51. Indeed, such programming seems to have been productive, as NN received all "satisfactories" on his report card in every subject for the four periods listed during the 2010-2011 school year at Newfound. *See* Pl.'s Ex. 2, 1 (noting grading scale ranging from "failure" to "needs improvement" to "satisfactory" to "outstanding").[15]

As of April 2011, NN was isolated from his peers, apparently for their own safety. *See* Pl.'s Ex. 2, p. 10. At the time of the evidentiary hearing, however, it seemed like NN was able to interact with other students, at least at times. *See* Tr. 52 (describing activity with other students). At that time, Newfound supervised NN all day long every day via a one-on-one instructional aide. *See id.* at 51. Dr. Guernsey testified that this procedure was effective in that the aide was able to keep NN's behavior under control so that he could engage in learning. *Id.* The Court notes that although this is not the LRE for NN, it is an appropriate response to NN's needs. This, taken into consideration with the above facts and the caselaw teaching that parents' private school placements need not comply with the IDEA's strict requirements, leads the Court to hold that Newfound is a proper placement under the IDEA.

_____

[15]The Court notes that Newfound does not offer speech services. *See* Tr. 63-64. Although all parties concede that NN's speech and ability to communicate is deficient, the Court does not find that Newfound's lack of speech services bars an appropriateness-of-placement finding. Rather, the Court takes this factor into consideration, along with the vast improvement in behavior and academics that NN has demonstrated while at Newfound.

### B. Ennis Must Reimburse Novak's Private School
### Expenses for the 2009-2010 School Year

In her decision, the SEHO decided that, had Novak been entitled to reimbursement, the SEHO would limit reimbursement to the period of time from August 31, 2009, the date of enrollment at Newfound, to November 11, 2009, the date of the sufficient IEP.  SEHO Order 14.  Novak argues that the reimbursement period should instead begin from March 5, 2009, the date of the insufficient IEP.

The Court is cognizant that IDEA's equitable retroactive reimbursement remedy is not a damages provision.  As discussed above, "[r]eimbursement is available as a remedy when parents have incurred costs for obtaining services that the school district was required to provide."  *Thomas v. East Baton Rouge Parish Sch. Bd.*, 29 F. Supp. 2d 337, 339 (M.D. La. 1998).  Novak first began incurring such costs August 31, 2009.  Thus, the Court uses this date as a starting point for reimbursement purposes.[16]

The Court finds that reimbursement for the 2009-2010 school year is appropriate.  The SEHO established that Ennis failed to provide NN with a FAPE as of March 5, 2009.  The SEHO further found, and this Court affirmed, that Ennis failed to provide NN with a FAPE until November 2009 – after the 2009-2010 school year had begun.  During this time, Novak placed NN at Newfound.  Once Ennis successfully provided NN with a FAPE via the November 11, 2009 IEP, NN had been at Newfound for approximately one-and-a-half months.  As change is extremely difficult for NN, *see, e.g.*, Tr. 25 ("[E]xpecting him to

_____

[16]*See infra* Part V.C for discussion of the March 5, 2009 to August 31, 2009 period.

ORDER – PAGE 21

transition or do something too fast can trigger a meltdown, a meltdown being a violent behavior, an aggressive behavior.  Expecting – anything new, something new and different can trigger a kind of behavior like that."); *id.* at 49-50 ("Unless NN is kept in a very strict pattern, daily pattern of expectations, his behavior will certainly interfere [with his ability to make academic progress] in . . . all sorts of ways."), Novak was justified in not immediately removing NN from Newfound upon receiving the proposed November 2009 IEP.  The Court believes that such removal would have been extremely detrimental to NN given both the recent school change and the confusion of joining a classroom at Ennis in the middle of the semester.

Accordingly, equitable considerations militate toward awarding reimbursement for the entire 2009-2010 school year.  *Cf. Kitchelt ex rel. Kitchelt v. Weast*, 341 F. Supp. 2d 553, 557 (D. Md. 2004) (holding that plaintiff was entitled to half a private school year's tuition where public agency denied child FAPE for one month).  However, the Court limits the reimbursement period to this time frame.[17]

_____

[17]There is some indication that, going forward, NN's current IEP is no longer adequate.  For example, at the hearing, Novak raised some question as to whether any public educational setting is now an appropriate placement for NN.  Dr. Guernsey testified that it was "highly unlikely" N.N. could function in a public high school and that in his estimation it could be "disastrous" and "irresponsible."  Tr. 454.  Dr. Guernsey further testified that re-enrolling N.N. in a public institution could pose a risk to N.N. himself, and to those around him.  *Id.*  Based in part on this testimony, Novak asks the Court for reimbursement for the cost of placing N.N. at Newfound from August 31, 2009 and into the foreseeable future.  But even if NN's current IEP is inadequate for his present condition, the parties did not present, and the Court has not found, case law supporting the notion that the Court may award prospective monetary relief in an such an instance – where a court has held that a proposed IEP provided a FAPE at the time the school district proposed it, but that a similar IEP placing the disabled child in a public school setting would not currently provide a FAPE.

### *C. The Court Grants NN Compensatory Education for a Three Month Period*

The Court additionally grants NN compensatory education approximately equal to the period between March 5, 2009 and the end of the 2008-2009 school year. "Compensatory education basically orders a public agency to provide future educational services (either within the public agency or through payment at a private placement) to make up for past deficiencies." Kaltsounis, *supra* at § 31. Based on the evidence in the record, the Court holds that Ennis must provide NN with compensatory education for a three month period in recompense for the approximately three months during the 2008-2009 school year (March to the end of the school year) that Ennis failed to provide NN a FAPE. Such compensatory education shall be provided via three months worth of Newfound's tuition and fees during the 2010-2011 school year.

### VI. ENNIS MUST ABIDE BY CERTAIN REQUIREMENTS IF NOVAK SEEKS A NEW IEP

Lastly, in accordance with the Court's broad discretion to order equitable relief, the Court agrees with the SEHO that Ennis must abide by certain requirements if Novak chooses to try and work with Ennis to develop a new IEP.[18] The SEHO generally required that: (a) Ennis engage the services of Dr. Felini-Smith and collaborate with Newfound staff to assist

---

If it is true that a public institution is no longer adequate, Novak should request a new IEP and present the same sort of information to Ennis' ARD as she presented to the Court. If NN's current condition makes a public school placement inadequate, the new IEP should reflect that fact. And if Novak disagrees with the new IEP, she should appeal the decision through the usual administrative process.

[18]The Court is in no way ordering – or even suggesting – that Novak place NN back at Ennis.

ORDER – PAGE 23

the ARD Committee in the development of a new appropriate IEP for NN's return to Ennis; (b) Ennis engage the services of Dr. Felini-Smith to train all staff who will work with NN within thirty days following NN's re-enrollment at Ennis; (c) Ennis' autism specialist provide consulting services that the ARD Committee, in consultation with Dr. Felini-Smith, deems appropriate; (d) Ennis, in consultation with Dr. Felini-Smith, provide notice of its intent to conduct a parent-training and in-home training assessment within ten days of NN's return to Ennis, and, thereafter, provide services as the assessment recommends; and (e) after the above, Ennis' autism consultant provide consulting services regarding NN's disability and behavior.  SEHO Order 15.

Novak complains that the SEHO's conditions are inadequate because: (a) the law requires Ennis to have an appropriate IEP in place before NN returns to Ennis; (b) the vast majority of the requirements have no set completion date; (c) Dr. Felini-Smith is a private psychologist and therefore not at Ennis' beck and call; (d) the SEHO did not specify the contents of the required training, the number of hours it should be, how often the training should occur, and how Ennis will measure the competence of the trainees or address the concern that, while the training is underway, untrained or inadequately-trained staff would be in charge of addressing NN's needs; and (e) the SEHO did not identify the autism specialist.  Mot. 32-33.  To address these concerns, the Court imposes the following conditions in place of the SEHO's conditions:

In the event Novak wishes to transfer NN back to Ennis, Novak shall provide Ennis

notice as soon as possible prior to the transfer.  Following Novak's notice but prior to NN's

transfer,[19] Ennis shall complete the following requirements at sole cost to Ennis:

> (A) Ennis shall engage the services of Dr. Felini-Smith and Newfound staff to assist the ARD Committee in the development of a new appropriate IEP for NN; if Dr. Felini-Smith is unavailable, the ARD Committee and Novak shall agree on an alternate psychologist; the ARD Committee shall review existing evaluation data as well as NN's current levels of performance at Newfound to determine if further assessment is needed, document that need, and conduct the assessments as appropriate; in making a recommended placement determination, Ennis and Dr. Felini-Smith/alternate psychologist shall strive to make only the necessary changes to NN's Newfound placement – paying serious attention to the Court's finding and the evidence in the record that – unless circumstances have drastically changed – a public school is unlikely to provide NN a meaningful educational benefit;

> (B) If the proposed IEP recommends a placement at Ennis, Ennis shall be subject to the following additional conditions:

> > (1) Ennis shall engage the services of Dr. Felini-Smith to complete a training of all staff who will work with NN; if Dr. Felini-Smith is unavailable, the ARD Committee and Novak shall agree on an alternate psychologist to facilitate the training; Dr. Felini-Smith or the alternate psychologist shall conduct the training – however, if they are unavailable to conduct the training, the persons selected by Dr. Felini-Smith or the alternate psychologist shall conduct the training; the training shall occur prior to NN's transfer to Ennis; the training shall be the length of time and cover the curricula determined by Dr. Felini-Smith or the alternate psychologist; in the event a democratic vote of the ARD Committee and Novak deem the training insufficient, a subsequent training shall take place, run by Dr. Felini-Smith, the alternate psychologist, or another psychologist chosen by agreement between the ARD Committee and Novak, within thirty (30) days of the determination that the prior training was inadequate; following the initial training and, if applicable, the subsequent training, the ARD Committee shall ensure that

---

[19]Unless Novak provides less than seventy-five (75) days notice, in which case Ennis must meet the following conditions within seventy-five (75) days after Novak gives notice of the transfer.

Ennis' staff who work with NN will be trained at least once per school year by a psychologist chosen by agreement by the ARD Committee and Novak; and

(2) Ennis, in consultation with Dr. Felini-Smith, Gammage, and Newfound staff, shall conduct a parent-training and in-home-training assessment, and thereafter provide services as recommended by the assessment; if either Dr. Felini-Smith or Gammage are unavailable, the ARD Committee and Novak shall agree on an alternate psychologist and/or behavioral specialist as applicable.

(3) Finally, after the conclusion of the above requirements and NN's transfer back to Ennis, again at sole cost to Ennis, Ennis shall engage the services of an agreed-upon (by the ARD Committee and Novak) specialist (whether it be psychologist, behavioral specialist, or autism specialist) to provide consulting services for any issues that occur regarding NN's education or behavior for three (3) years from the date of NN's re-enrollment.

## CONCLUSION

The Court grants in part and denies in part Novak's motion. Specifically, it affirms the SEHO's determination that the November 11, 2009 IEP did not deny NN a FAPE, and it overrules the SEHO's determinations that (a) NN is not entitled to reimbursement and (b) the reimbursement period to August 31, 2009 - November 11, 2009. The Court instead holds that NN is entitled to reimbursement for Novak's tuition and fee expenses at Newfound for the 2009-2010 school year ($15,200) and that Ennis must additionally pay Novak for a three month period of tuition and fees at Newfound during the 2010-2011 school year.[20] The Court also modifies the conditions the SEHO imposed on Ennis in the event Novak seeks a new IEP.

---

[20]If the parties cannot agree to an appropriate monetary amount, Novak may file a motion with the Court to determine the amount of appropriate relief.

The parties are directed to confer regarding the form of judgment.  If the parties are unable to agree on a form of judgment, they are directed to each submit their proposed form of judgment twenty-one (21) days from the date of this order.


Signed September 11, 2012.


David C. Godbey
United States District Judge